[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 04-16650, 04-16651, 05-10031
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 18, 2006
THOMAS K. KAHN
CLERK

D.C. Docket Nos. 03-01903-CV-T-17MAP, 03-01904-CV-T-17TGW, 04-01668-CV-T-17EAJ & 92-16406-8B1

IN RE: Sunshine Jr. Stores, Inc.
d.b.a. Sunshine Supermarkets
d.b.a. Jr. Food Stores,

                                                            Debtor.
_____

BANK OF NEW YORK,

                                                   Plaintiff-Appellant,

                          versus

SUNSHINE-JR. STORES, INC.,

                                                   Defendant-Appellee.
_____

Appeals from the United States District Court
for the Middle District of Florida
_____

**(July 18, 2006)**

Before TJOFLAT and BARKETT, Circuit Judges, and MILLS*, District Judge.

---

*Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

TJOFLAT, Circuit Judge:

In this Chapter 11 case, the bankruptcy court sanctioned the Bank of New York ("BONY") for repeatedly refusing to obey several orders the court issued for the benefit of Sunshine-Jr. Stores, Inc. (The "Debtor"). First, the court struck BONY's response to the Debtor's claim for interest on funds BONY held as a fiduciary for the Debtor. Second, having struck BONY's response, the court gave the Debtor judgment for the interest. Third, the court ordered BONY to pay the Debtor's attorney's fees.

BONY appealed these decisions to the district court, which affirmed. BONY now appeals to this court. BONY acknowledges that it held the Debtor's funds, as alleged, but asserts that it was not doing so as a fiduciary and thus had no obligation to pay interest on those funds. As for the sanctions, BONY contends that they were inappropriate on several grounds. We are unpersuaded by BONY's arguments and therefore affirm.

Part I of this opinion sets out the factual background of this case. Part II analyzes BONY's various challenges to the bankruptcy court's imposition of sanctions, award of interest, and award of attorney's fees. Part III addresses BONY's claim that it was an Indenture Trustee with contractual duties, not a conventional trustee with an implied fiduciary duty. Part IV briefly concludes.

2

**I.**

In December 1992, the Debtor commenced Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Middle District of Florida. On May 12, 1994, the bankruptcy court confirmed the Debtor's Plan of Reorganization ("Reorganization Plan"). As part of the Reorganization Plan, the Debtor executed a Trust Indenture Agreement (also referred to herein as the "Agreement"). The purpose of the Agreement was to establish an efficient method for paying the Debtor's general unsecured creditors ("Class 7 Creditors"), who were numerous and geographically scattered. Under the Agreement, each Class 7 Creditor was issued a promissory note (the "Notes") in satisfaction of its allowed claim.[1] These Notes were then secured by a lien on substantially all of the Debtor's assets, valued at approximately $14 million (the "Collateral").[2]

To avoid the administrative difficulties of having each individual Noteholder hold a lien on the Collateral, the Trust Indenture Agreement appointed

---

[1] The Notes were set to mature on May 12, 1999, the fifth anniversary of the confirmation. No payments were to be made to Noteholders during the first year after confirmation. Beginning with the second year, principal and interest were to be paid by the Debtor on a quarterly basis.

[2] Section 1.01 of the Trust Indenture Agreement defines "Collateral" as the real and personal property of the Debtor, any individual item of such real and personal property, and the "Escrow Account." That section defines "Escrow Account" as an account established and owned by the Debtor into which the Debtor is required to place the net proceeds from the sale of any of the Collateral that secures the Notes, with certain specified exceptions not relevant to this appeal.

an Indenture Trustee to hold the liens in trust for the benefit of all Noteholders.[3]

The Agreement limited the responsibilities and duties of the Indenture Trustee to those specifically set forth in the Agreement, qualified under the Trust Indenture Act of 1939 ("TIA").[4] The Agreement also permitted the creation of a separate trust in which the Debtor would place funds sufficient to satisfy the principal and interest of the Notes in full, if the Debtor decided to call the Notes in advance of maturity (the "Prepayment Funds").[5] The Debtor appointed NationsBank as the Indenture Trustee.

In 1995, E-Z Serve Convenience Stores, Inc. ("E-Z Serve") agreed to acquire the Debtor and its assets, including the Collateral.[6] To allow the acquisition to proceed, the Debtor on July 6, 1995 moved the bankruptcy court to enter an order allowing all of the Notes to be called and prepaid in full, and

---

[3] The Indenture Trustee was empowered to sue the Debtor for payment of the Notes on behalf of the Noteholders or foreclose on the liens.

[4] 15 U.S.C. §§ 77aaa-77bbbb (2005).

[5] Section 15.01 of the Trust Indenture Agreement provided that "[t]he Notes may be prepaid before their Stated Maturity in accordance with their terms and in accordance with this Article, and Section 4.01 G." Section 4.01 G stated that "[t]he Company shall have the option to prepay the Notes in whole or in part (in increments of $250,000.00), without premium or penalty. Prepayments can be made at any time upon at least five days' written notice."

[6] For simplicity, "Debtor" will refer collectively to Sunshine-Jr. Stores, Inc. and its successor-in-interest, E-Z Serve.

directing the Indenture Trustee to release its liens on the Collateral. The bankruptcy court granted the Debtor's motion, and on October 2, 1995, the Debtor called the Notes for prepayment and deposited with NationsBank approximately $1 million, the amount necessary to prepay all of the Notes. The Notes became immediately due and payable by the Debtor when they were called and ceased to accrue interest. Upon receipt of the Prepayment Funds, NationsBank released the liens on the Collateral.

In December 1995, BONY acquired the corporate trust division of NationsBank. As part of this acquisition, NationsBank transferred to BONY $983,935.11 in Prepayment Funds that had yet to be claimed by Noteholders. The record does not indicate whether BONY also received from NationsBank a copy of the Trust Indenture Agreement or the Debtor's Reorganization Plan, or whether it was otherwise apprised of the circumstances under which NationsBank came into possession of the Prepayment Funds. BONY nevertheless disbursed Prepayment Funds to those Noteholders who tendered their Notes.

According to the Debtor, it made several requests of two BONY officers, Irene Siegel and Janet Lee (née Wong), to account for those Noteholders who had yet to tender their Notes for payment. BONY then provided what the Debtor regarded as an inaccurate printout of the unpaid Noteholders. Based on this

5

printout, the Debtor issued a second call notice to Noteholders. BONY paid those Noteholders who then tendered their Notes. During this period, the Debtor continued to ask BONY for a more accurate accounting, but BONY did not respond to its requests.

On April 24, 2000, the Debtor moved the bankruptcy court to issue an order requiring BONY to provide a final accounting for all payments NationsBank and BONY made to Noteholders, and to establish procedures for paying those Noteholders who sought payment but had lost their Notes. The Debtor served the motion on "Janet Wong, Bank of New York" that day. BONY did not oppose the motion or otherwise respond to it. The court granted the motion and ordered BONY to provide the Debtor with a full accounting no later than June 1, 2000.[7] The order further stated that "[i]f the Indenture Trustee fails timely to provide said accounting and statement [of all claimants for whom funds still are being held], this Court shall issue an Order to Show Cause as to why the Indenture Trustee has failed and refused to fulfill its fiduciary duty to the Debtor." BONY did not provide the Debtor with a final accounting by the date mandated by the court, nor

---

[7] Specifically, the bankruptcy court ordered BONY to "provide the Debtor's counsel with an accounting of all payments made pursuant to the Trust Indenture, as well as a statement of all claimants for whom funds still are being held, their addresses and the listed amounts of their allowed claims (the face amount of their note)."

did it otherwise respond to the court's order.

On December 13, 2000, the Debtor moved the court for an order "directing The Bank of New York to pay EZ Serve [sic] all remaining money that it has on deposit pursuant to the trust indenture, plus any and all other funds which currently are in its custody, possession and control that in any way relate to [the Debtor]."[8] The Debtor served this motion on "Irene Siegal, Vice President, The Bank of New York" the same day. Again, BONY did not oppose or otherwise respond to the motion. The court granted the motion on February 23, 2001, and ordered BONY to provide to the Debtor's counsel "a complete accounting reflecting all payments made to creditors" no later than March 31, 2001 (the "February 23 Order"). The court further directed the Debtor to publish a notice in periodicals serving those areas in which most of the remaining Noteholders resided, stating that all outstanding claims and Notes had to be tendered for payment within 30 days of the notice publication date. After that 30-day period expired, the Prepayment Funds held by BONY would be returned to the Debtor "in

---

[8] The Debtor's motion was based on 11 U.S.C. § 347(b), which states:
Any security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under chapter 9, 11, or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan confirmed under section 943(b), 1129, 1173, or 1225 of this title, as the case may be, becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.
11 U.S.C. § 347(b) (2005).

7

accordance with federal law." The Debtor published the notice on March 30, 2001, and filed a Notice of Publication with the court on April 10, 2001.[9] Again, BONY did not respond to the court's order, and did not release the Prepayment Funds to the Debtor.

On May 11, 2001, the Debtor moved the court for an "order to show cause," alleging that although BONY had "provided the Debtor with some information about 'recent' payments, it ha[d] failed to provide a complete accounting, which would allow the Debtor to conclude the case."[10] The Debtor served this motion on "Irene Siegal, Vice President, and Janet Wong, of The Bank of New York." Even though an amended motion for an order to show cause was served on Siegal and Wong on May 14, 2001, and a second amended motion was sent by certified mail to Wong on May 31, 2001, BONY did not respond.[11] The court granted the Debtor's motion on June 14, 2001, and entered an order commanding BONY to

---

[9] Pursuant to the February 23 Order, the Debtor was entitled to receive the unclaimed Prepayment Funds from BONY after April 29, 2001 or, presumably, the next business day.

[10] Neither the May 11 motion for an order to show cause nor the first and second amended motions referred to in the following text indicated the relief the Debtor was seeking. Although the record is silent on the point, we assume that the Debtor was invoking the court's civil contempt power under 11 U.S.C. § 105. See Hardy v. United States, 97 F.3d 1384, 1389 (11th Cir. 1996).

[11] The Debtor's first motion was filed by E-Z Serve. The first amended motion was filed by Swifty Serve, Inc., which purported to be Sunshine-Jr. Stores, Inc.'s successor-in-interest. The second amended motion was identical to the first, except that it was served on Wong by certified mail.

appear before the court on August 13, 2001 "to show cause why the Debtor should not be granted the relief requested." As before, BONY ignored the order and failed to appear on August 13, 2001 as directed.

At the August 13 hearing, the court stated that BONY owed both the Debtor and the court a fiduciary duty, and that it had failed to carry out that duty. Accordingly, the court stated its intention to set an evidentiary hearing at which it would determine the reasonable interest rate that BONY owed to the Debtor on the Prepayment Funds. The court also stated that it would determine the appropriate attorney's fees and costs to charge BONY for its failure to comply with the court's orders.

On September 12, 2001, the court entered an "Order to Show Cause for Contempt Against Bank of New York," reiterating what it had announced at the August 13 hearing (the "September 12 Order"). In that order, the court held (1) that "BONY owes a fiduciary duty to this Court, the Reorganized Debtor, and its creditors;" (2) that "BONY's fiduciary duty includes an obligation to provide this Court and the Reorganized Debtor with an adequate accounting of the funds it received, those it has paid, and the amount it continues to hold for the Reorganized Debtor and its creditors;" and (3) that "BONY's fiduciary duty includes payment of reasonable interest on the funds that it holds for the Reorganized [Debtor]."

The court therefore ordered BONY within 20 days to transfer to a trust account maintained by the Debtor's counsel all funds that it was holding for the Debtor. The September 12 Order also scheduled a hearing for October 30, 2001 "to determine the reasonable interest rate that BONY shall be required to pay for the funds it has held on behalf of the Reorganized Debtor and its creditors," and to "determine the appropriate amount of fees and costs to surcharge against BONY for its failure to follow this Court's Orders and to provide an appropriate accounting."

On October 29, 2001, BONY finally appeared before the court.[12] At that hearing, BONY acknowledged that it had not responded to the court's previous orders, and informed the court that it was in possession of $487,844.90 of Prepayment Funds that had yet to be disbursed to Noteholders. The court ordered BONY immediately to return the unclaimed Prepayment Funds to the Debtor,[13] which it did. The court also ordered the parties to meet in a good faith effort to reach a final accounting of the Prepayment Funds. The court retained jurisdiction to determine "the reasonable interest rate that [BONY] may be required to pay" on

---

[12] The court rescheduled the hearing for October 29, 2001 at the request of the Debtor.

[13] The court stated that "[t]he transfer of the [Prepayment] Funds . . . shall be in full and complete satisfaction of [BONY]'s obligations to creditors pursuant to the Reorganized Debtor's plan of reorganization and shall absolve [BONY] from any further liability to such creditors."

10

the Prepayment Funds, and the amount of the Debtor's attorney's fees and costs BONY should be surcharged for its "failure to comply with the Court's prior orders."

On April 16, 2002, the Debtor's counsel moved the court for an order awarding it "reimbursement for the fees and expenses incurred to obtain a final accounting from the Bank of New York . . . during the period beginning December 8, 2000 and ending October 26, 2001." The motion stated that BONY's counsel "began to be responsive on or about October 26[, 2001]; however, the Debtor did not receive an accounting for several months thereafter." In an April 26, 2002 order, the court directed the Debtor to "commence a contested matter by filing a Motion seeking interest on the amounts held by BONY," and BONY to "respond to the Debtor's Motion and to its [attorney's] fee application" by June 14, 2002.

On May 16, 2002, the Debtor filed a "Motion to Surcharge [BONY] and to Direct Payment of Interest" (the "Surcharge Motion"), in which it sought "an Order surcharging [BONY] and directing it to pay the Debtor interest, or investment income, on the funds held by BONY pursuant to [the] Trust Indenture [Agreement]." The Debtor asserted that under Florida law, BONY had breached its fiduciary duty to provide the Debtor with a timely accounting and to invest the Prepayment Funds it held in trust. The Debtor also claimed that BONY had

11

violated the terms of the Trust Indenture Agreement, which required the Prepayment Funds promptly to be returned to the Debtor three years after the Notes became due and payable. As the Notes were called on October 2, 1995, BONY was required to return the Prepayment Funds on October 3, 1998, but BONY did not do so until ordered by the court on October 29, 2001. The Debtor calculated that it was entitled to $273,343.87 in interest.

In opposition to the motion, BONY argued that it did not owe any interest on the Prepayment Funds because it was an Indenture Trustee under the Trust Indenture Agreement. The TIA, which governs the creation of Trust Indentures, states that an Indenture Trustee would be under no obligation to perform any duties other than those expressly set forth in the trust indenture.[14] BONY therefore asserted that its obligations to the Debtor and the Noteholders were solely contractual, and that Section 10.06 of the Agreement specifically stated that "the Trustee shall be under no liability for interest on any money received by it

---

[14] The TIA, at 15 U.S.C. § 77ooo(a)(1), states:
  (a) Duties prior to default:
  The indenture to be qualified shall automatically be deemed (unless it is expressly provided therein that any such provision is excluded) to provide that, prior to default (as such term is defined in such indenture) –
    (1) the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in such indenture. . . .

hereunder except as otherwise agreed with the [Debtor]." BONY offered no

alternative method for calculating the interest on the Prepayment Funds in the

event the court found that interest was owed to the Debtor.

The court scheduled a final evidentiary hearing for September 17, 2002, to

assess such interest. At BONY's request, it postponed the hearing to April 17,

2003. On September 19, 2002, the Debtor served a "Request for Production of

Documents" on BONY seeking information related to the Trust Indenture

Agreement, BONY's investment of the Prepayment Funds, and BONY's interest

income on unrelated trust indentures. In a letter dated October 29, 2002, the

Debtor outlined the topics on which it sought to depose BONY and certain of its

employees. The Debtor followed this letter with a formal deposition notice,

pursuant to Federal Rule of Bankruptcy Procedure 7030 and Federal Rule of Civil

Procedure 30(b)(6),[15] on November 13, 2002. BONY agreed to produce certain

documents and to be deposed on certain topics, but otherwise objected to the

---

[15] Fed. R. Bank. P. 7030 incorporates by reference Fed. R. Civ. P. 30. Rule 30(b)(6) states, in relevant part:

> A party may in the party's notice and in a subpoena name as the deponent a public or private corporation . . . and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. . . . The persons so designated shall testify as to matters known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6).

requests. On November 15, 2002, BONY moved the court for a protective order. Thereafter, the Debtor's counsel deposed several of BONY's employees.

On January 29, 2003, the court granted in part and denied in part BONY's motion for a protective order (the "January 29 Order"). It also entered a discovery order. The order instructed BONY to produce documents and witnesses pertaining to: (1) the interest BONY had paid on funds received under unrelated trust indentures; (2) BONY's normal course of business investment strategy regarding trust funds received and invested; (3) BONY's rate of return on trust funds it invested in a fiduciary capacity; (4) the rate of interest BONY was paying on trust funds it received; and (5) BONY's normal strategy for handling trust funds. The court ordered BONY to provide this information for the period from December 1995 to October 2001. In addition, the court ordered the Debtor to produce all documents relating to the Debtor's counsel's fees and costs, and the interest that had been earned on the funds BONY had turned over to the Debtor.

Instead of producing the documents and witnesses as ordered, BONY moved to dismiss the contested matter for lack of subject matter jurisdiction. Along with its motion to dismiss, BONY filed yet another motion for a protective order in which it asked the court to stay discovery of the information that the court had ordered BONY to produce. The court denied both motions.

14

Thereafter, counsel for the parties exchanged correspondence in which BONY insisted that the Debtor's discovery requests were too broad to be manageable, and asked the Debtor to narrow the scope of its requests. In any event, the Debtor did not receive the information to which the court's January 29 Order referred. On April 2, 2003, the Debtor moved the court for sanctions. It asked the court to (1) hold BONY in contempt of court for failure to comply with the January 29 Order; (2) strike BONY's defenses to the Surcharge Motion; (3) award the Debtor interest on the Prepayment Funds at the Florida statutory interest rate; (4) prohibit BONY from introducing evidence on the rate and amount of interest applicable to the Prepayment Funds; and (5) award the Debtor attorney's fees.

In its written opposition to that motion, BONY denied that it had refused to comply with the court's order. Rather, BONY claimed that it attempted to facilitate an efficient process by which the Debtor's counsel could review the documents described in the January 29 Order which, according to BONY, were numerous and voluminous. BONY also reasserted the defense it had raised in its opposition to the Surcharge Motion by claiming that "[u]nder the bright light of prevailing federal law on trust indentures, [the Debtor] is not entitled to the relief it has demanded." In other words, BONY again claimed that it was an Indenture

15

Trustee, not a common law trustee, and therefore was under no obligation to the Debtor to pay interest on the Prepayment Funds.

At an April 7, 2003 hearing, the court stated that it was unpersuaded by BONY's arguments, and granted the Debtor's motion in full.[16] Clearly frustrated by BONY's recalcitrance, the court emphasized in its May 9, 2003 order (which memorialized the decision it had reached at the April 7 hearing) that BONY was still unprepared to provide the information regarding the Prepayment Fund interest rate described in the January 29 Order. It found that BONY's failure to provide the Debtor with documents and witnesses as required constituted "slacking off," "dawdling, putting up barriers and obfuscating."

Citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991), the court observed that it had the inherent power to sanction litigants for bad faith conduct. Given that BONY repeatedly had ignored the court's orders between April 2000 and October 2001, and had refused to comply with the Debtor's discovery requests even after being ordered to do so, the court concluded that BONY had acted in bad faith and that sanctions were appropriate. The court awarded the Debtor the attorney's fees and costs it had incurred from December 8,

_____

[16] The court also cancelled the final evidentiary hearing that was to take place on April 17, 2003.

2000 to October 26, 2001, which amounted to $14,440.19. The court also allowed the Debtor to amend its attorney's fee application to reflect work counsel had performed through April 17, 2003.

In addition, the May 9 order included a "default" against BONY on the question of Prepayment Funds interest. The court did not explicitly address whether BONY was an Indenture Trustee or a common law trustee, i.e., whether in either capacity, BONY was liable to the Debtor for interest on the Prepayment Funds. Rather, the court quoted the portion of its September 12, 2001 order in which it held that BONY owed the Debtor a fiduciary duty that included paying interest, and moved directly to the amount of interest BONY owed, which it calculated to be $285,568.29.[17] In effect, the court struck <u>sub</u> <u>silentio</u> BONY's opposition to the Surcharge Motion, in which it argued that it was an Indenture Trustee without any liability for interest; the bankruptcy court never considered the merits of that argument. On June 23, 2003, the court entered a final judgment on its award of interest and attorney's fees to the Debtor.

BONY appealed the imposition of these sanctions to the district court. The

---

[17] The court ordered BONY to pay interest on the Prepayment Funds at the prime rate, compounded monthly, beginning in April 1996 and ending on October 30, 2001. The court chose April 1996 based on its belief that many of the Notes would have been paid in the first six months after the Notes were called. Apparently, the court believed that BONY would have waited until after this flurry of redemptions to invest the funds.

district court affirmed the imposition on two grounds. First, it concluded that BONY's repeated failure to obey the bankruptcy court's orders warranted the attorney's fees sanction. Second, the court determined that BONY was a common law trustee, not an Indenture Trustee, and as such owed the Debtor a fiduciary duty, including the obligation to disgorge any interest it had earned on the Prepayment Funds. By addressing the question of whether BONY was an Indenture Trustee, as BONY contended, the court decided the merits of an argument the bankruptcy court had declined to consider. Put another way, the court approached the bankruptcy court's sub silentio strike of BONY's Indenture Trustee defense as if the bankruptcy court had actually considered the defense and rejected it.

The district court reasoned that the Trust Indenture Agreement terminated when the Debtor transferred the Prepayment Funds to NationsBank. "When sufficient funds were provided to satisfy the outstanding notes, the trustee's authority ended and the rights and obligations under the [Trust Indenture Agreement] were extinguished." Thus, NationsBank held the Debtor's Prepayment Funds as a conventional trustee under a trust separate from the trust in which the Indenture Trustee held the liens on the Debtor's Collateral. When BONY purchased NationsBank's corporate trust division it, too, became a

conventional trustee with a fiduciary duty, as opposed to an indenture trustee with contractually-based obligations. Citing 11 U.S.C. § 347(b), the court concluded that BONY had a fiduciary duty to return to the Debtor any proceeds earned on the Prepayment Funds.

The district court also rejected BONY's argument that the bankruptcy court had denied it due process of law in imposing the sanctions. BONY claimed that it did not receive adequate notice from the bankruptcy court that its conduct could result in sanctions. However, the bankruptcy court's finding that BONY repeatedly ignored numerous motions served by the Debtor, and orders issued by the court, convinced the district court otherwise. The court therefore concluded that the bankruptcy court had not abused its discretion when it invoked its inherent powers to sanction BONY. The court also noted that BONY deliberately withheld information from the Debtor in breach of its fiduciary duty, which exposed it to sanction under Florida law.

BONY now appeals to this court, presenting four arguments for reversal. First, BONY reasserts that it was an Indenture Trustee owing strictly contractual obligations to the Debtor, not a conventional trustee with an implied fiduciary duty. This contractual obligation did not require BONY to invest the Prepayment Funds, or to distribute interest earned on those funds to the Debtor. Second,

BONY believes that the bankruptcy court made no findings of bad faith against it as a litigant and thus could not have invoked its inherent powers to impose sanctions. Third, BONY again asserts that the bankruptcy court denied it due process by failing to provide notice that its conduct was sanctionable. The crux of this argument is that the court's orders did not use the terms "sanction" or "contempt," which would have alerted BONY's non-lawyer officers – namely Irene Siegel and Janet Wong – to the fact that failure to obey the orders would result in punishment. BONY's officers presumably lack the sophistication to anticipate such a consequence unless provided these explicit signals. Finally, BONY argues that the Debtor did not need to pursue any discovery, and thus did not need to incur any attorney's fees, regarding the Prepayment Funds interest rate. BONY claims that the bankruptcy court should have applied a prejudgment interest rate as provided in 28 U.S.C. § 1961.

"A correct judgment may be affirmed on any ground regardless of the grounds addressed, adopted or rejected by the district court." Sosa v. Chase Manhattan Mortgage Corp., 348 F. 3d 979, 983 (11th Cir. 2003) (citations omitted). We accordingly affirm the district court on two grounds. First, we affirm the district court's holding that the bankruptcy court did not abuse its discretion when it invoked its inherent power to impose sanctions on BONY.

Alternatively, we uphold the district court's conclusion that BONY was a common law trustee with respect to the Prepayment Funds, and was therefore liable to the Debtor for interest. We do so even though the district court approached this question as if the bankruptcy court addressed it on the merits, when in fact the bankruptcy court simply refused to consider it.

## II.

BONY makes essentially three arguments challenging the bankruptcy court's imposition of sanctions. First, BONY believes that the district court did not find the bad faith necessary to invoke its inherent power to impose sanctions. Second, BONY claims that the bankruptcy court did not provide it with fair notice that it was subject to sanctions. Third, BONY would convince us that the discovery pursued by the Debtor to determine the appropriate interest rate applicable to the Prepayment Funds was unnecessary because the bankruptcy court should have applied a prejudgment interest rate set forth in 28 U.S.C. § 1961. We address each argument in turn.

### A.

Federal courts have the inherent power to impose sanctions on parties, lawyers, or both. Byrne v. Nezhat, 261 F.3d 1075, 1121 (11th Cir. 2001); see also In re Mroz, 65 F.3d 1567, 1572 (11th Cir. 1995) (acknowledging bankruptcy

court's inherent power to impose sanctions). "This power is derived from the court's need 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" Byrne, 261 F.3d at 1106 (citing Chambers, 501 U.S. at 43, 111 S. Ct. at 2132) (alteration in original). We review a court's exercise of its inherent power for abuse of discretion. Mroz, 65 F.3d at 1572 (citing Chambers, 501 U.S. at 55, 111 S. Ct. at 2138). "In determining whether the court has abused its discretion we ask whether it 'applie[d] the wrong legal standard or ma[de] findings of fact that are clearly erroneous.'" Byrne, 261 F.3d at 1103.

As we have stated elsewhere, "'[t]he key to unlocking a court's inherent power is a finding of bad faith.'" Byrne, 261 F.3d at 1106 (quoting Barnes v. Dalton, 158 F.3d 1212, 1214 (11th Cir. 1998)). "A party . . . demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." Byrne, 261 F.3d at 1121 (quoting Barnes, 158 F.3d at 1214)). We therefore begin by reviewing the bankruptcy court's finding that BONY acted in bad faith.

Between April 2000 and October 2001, the bankruptcy court issued multiple orders and scheduled hearings to provide the Debtor with an accounting of the unclaimed Prepayment Funds, to ensure that the remaining Noteholders were able

22

to receive the payments to which they were legally entitled, and generally to bring closure to the Debtor's bankruptcy case.

The court's May 9, 2003 sanctions order contained a detailed chronology of BONY's repeated failure to respond to court orders, its failure to appear before the court when ordered, and its refusal to provide discovery pursuant to the court's January 29 Order. Based on this course of conduct, the bankruptcy court concluded that "BONY has repeatedly ignored the orders of this Court in bad faith, and BONY's dawdling and obfuscation in the response of the discovery requests, after this Court's ruling on BONY's motion for a protective order, have been done in bad faith."

BONY's noncompliance delayed the resolution of the Debtor's bankruptcy case, interfered with the bankruptcy court's ability to manage its case load, and, most obviously, hampered the enforcement of the court's orders. Moreover, BONY's conduct forced the Debtor repeatedly to appear before the court, seek relief from the court, and otherwise litigate matters that should have been resolved far more quickly. We therefore must conclude that the bankruptcy court did not abuse its discretion in finding that BONY acted in bad faith. The bankruptcy court properly invoked its inherent powers to sanction BONY.

1.

23

We also find that the bankruptcy court did not abuse its discretion in applying its inherent powers. As BONY correctly points out, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44, 111 S. Ct. at 2132. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." Id. at 44-45, 111 S. Ct. at 2132-33.

Under appropriate circumstances, it is within a court's discretion to assess attorney's fees on a party, or even to dismiss its lawsuit, for actions taken in bad faith. Id. at 45, 111 S. Ct. at 2133. In this case, the bankruptcy court sanctioned BONY for what reduces to two classes of conduct. First, BONY failed to obey or otherwise respond to the court's orders over an extended period of time. Second, BONY refused to comply with the court's January 29 Order, which directed BONY to provide the Debtor with information on the interest BONY had earned on the Prepayment Funds between April 1996 and October 2001.

In its discretion, the court assessed BONY with the Debtor's attorney's fees from December 8, 2000 through October 26, 2001. During this period BONY refused to comply with the court's orders to provide a complete accounting of the Noteholders it had paid, those that had yet to redeem their bonds, and the amount of unclaimed Prepayment Funds it held. The court also permitted the Debtor's

24

counsel to amend her fee application to reflect costs incurred through April 17, 2003, the hearing date at which the court expressed its intention to sanction BONY. This fee award was directly tied to the delays and protracted litigation caused by BONY's dilatory conduct, and therefore was not an abuse of the court's discretion.[18]

## 2.

The bankruptcy court also entered a default against BONY with respect to the interest payable to the Debtor on the Prepayment Funds. This default had the effect of striking BONY's opposition to the Surcharge Motion and its defense that it was an Indenture Trustee under no obligation to pay interest on Prepayment Funds to the Debtor. Dismissal of a party's complaint or answer, or striking its defenses, as a sanction for failure to comply with a court's orders is a heavy punishment. The "severe sanction of a dismissal or default judgment is appropriate only as a last resort, when less drastic sanctions would not ensure compliance with the court's orders." Malautea v. Suzuki Motor Co. Ltd., 987 F.2d 1536, 1542 (11th Cir. 1993) (upholding Fed. R. Civ. P. 37(b) sanction of striking defendant's answer and entering default judgment based on defendant's failure to

---

[18] The district court held that the Debtor was also entitled to attorney's fees under Fla. Stat. § 737.627. Since the court's inherent powers were sufficient to award the Debtor with attorney's fees, we need not review that holding.

25

comply with discovery orders). "However severe the sanctions though, we will not interfere unless important historical findings are clearly erroneous or – by the imposition of sanctions which are not just – there has been an abuse of discretion." Jaffe v. Grant, 793 F.2d 1182, 1189 (11th Cir. 1986) (quoting Marshall v. Segona, 621 F.2d 763, 767 (5th Cir. 1980) (internal quotation marks and alterations omitted)).

The Debtor first requested information from BONY on the interest income it had earned on the Prepayment Funds in September 2002. BONY sought a protective order to avoid providing some of that information. On January 29, 2003, the bankruptcy court granted the protective order in part and denied it in part, and ordered BONY to produce witnesses and documents relating to the interest earned on the Prepayment Funds. BONY did not ask the court to clarify its order as to which materials it was required to produce, nor did BONY appeal the partial denial of the protective order. Instead, BONY moved to dismiss the contested matter and sought yet another protective order (presumably to protect it from the court's discovery order). BONY was still unprepared to produce discovery on April 7, 2003, more than two months after it was ordered to do so by the court. Of course, BONY had already demonstrated its penchant for ignoring the court between April 2000 and October 2001.

26

Given BONY's clear history of bad faith stonewalling in this case, the bankruptcy court was well within its discretion to conclude that BONY had forfeited its opportunity to dispute both its liability to the Debtor for interest and the amount of interest it had earned on the Prepayment Funds. Though the district court did not explicitly find that other sanctions would have forced BONY to comply with the January 29 Order, such a conclusion is readily implied from the record. Entry of a judgment awarding that interest income to the Debtor was appropriate.

3.

BONY further argues that the bankruptcy court erred by using the monthly "prime rate" to calculate the interest earned on the Prepayment Funds. Instead, BONY believes that the court should have applied the prejudgment interest rate set forth in 28 U.S.C. § 1961, which applies to a party's failure to pay a sum of money by a date certain. Again, BONY forfeited this argument when it refused to obey the court's discovery order.

B.

Finally, BONY asserts a due process challenge to the bankruptcy court's imposition of sanctions, claiming that the court failed properly to notify BONY of the consequences of its failure to respond to the court's orders.

Courts must afford a sanctioned party due process, both in determining the bad faith required to invoke the court's inherent power to impose sanctions and in assessing fees. In re Mroz, 65 F.3d 1567, 1575 (11th Cir. 1995) (citing Chambers, 501 U.S. at 49, 111 S. Ct. at 2135). "Due process requires that the [party] be given fair notice that [its] conduct may warrant sanctions and the reasons why." Id. (citing Donaldson v. Clark, 819 F.2d 1551, 1559-60 (11th Cir. 1987)). Importantly, a party can be given notice from either the court or from the party seeking sanctions. Id. The party subject to sanctions must be afforded the opportunity to justify its actions either orally or in writing. Id. at 1575-76.

Here, BONY's assertion that it did not receive adequate notice that it could be sanctioned is, quite frankly, astounding. As we have already described in detail, BONY consciously and wilfully ignored numerous orders issued by the bankruptcy court over the course of eighteen months, and refused to appear before the court when commanded to do so. Moreover, BONY received the Debtor's numerous motions, including the May 14, 2001 motion which was based on BONY's "failure to comply with the clear terms of the Court's Orders." As the district court correctly observed, BONY's "blatant disregard for the Bankruptcy Court's orders is itself notice."

We note that BONY has never made the argument that it did not receive the

28

bankruptcy court's orders or hearing notices. Rather, BONY attempts to explain away its failure to respond by pointing to the fact that the court's orders were served on its non-lawyer employees. These non-lawyers should supposedly be excused from complying with the bankruptcy court's orders because the orders did not include the words "contempt" or "sanctions," which would have alerted them (as presumably unsophisticated bank employees) that their noncompliance would subject them to punishment. Unsurprisingly, BONY cites not one case to support this proposition.

It is equally unsurprising that this court has already stated "that even a non-lawyer should realize the peril to her case, when she . . . ignores numerous notices, and fails to attend hearings and depositions. Even a non-lawyer should realize the need to communicate either with the court or with opposing counsel." Anthony v. Marion County Gen. Hosp., 617 F.2d 1164, 1169 (5th Cir. 1980);[19] see also Moon v. Newsome, 863 F.2d 835, 838 n.5 (11th Cir. 1989). We also note that BONY offers no explanation as to why its non-lawyer employees did not refer the Debtor's motions and the bankruptcy court's orders to its legal department or its outside counsel upon receipt. In sum, BONY's arguments are unpersuasive.

---

[19] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Even if BONY is correct that the court's orders should have included the words "contempt" or "sanctions," we must still reject its argument. The bankruptcy court took specific steps to ensure that BONY received proper notice and opportunity to respond to the Debtor's request for interest. The court's April 26, 2002 order specifically directed the Debtor to "commence a contested matter by filing a Motion seeking interest on the amounts held by BONY," and for BONY to "respond to the Debtor's Motion and to its fee application." The Debtor's Surcharge Motion sought "an Order surcharging [BONY] and directing it to pay the Debtor interest, or investment income, on the funds held by BONY pursuant to [the] Trust Indenture [Agreement]."

Thus, BONY had ample notice that it could be required to pay interest and attorney's fees, and was given ample opportunity to defend itself. Indeed, BONY filed a response opposing the Surcharge Motion on June 14, 2002. The bankruptcy court did not direct BONY to pay attorney's fees or interest on the Prepayment Funds until April 7, 2003, almost a full year after the Debtor commenced the contested action. As BONY could have raised the notice issue with the bankruptcy court on any number of occasions, we find no plain error.[20]

---

[20] BONY concedes that it did not raise this issue before the bankruptcy court. Therefore, we review the bankruptcy court's decision for plain error. See Mike Ousley Prods. Inc. v. WJBF-TV, 952 F.2d 380, 383 (11th Cir. 1992) ("Because [the plaintiff's attorney] failed to raise

BONY's due process argument accordingly fails.

We now turn to BONY's assertion that the district court erred by finding that BONY was a common law trustee with a fiduciary duty, as opposed to an Indenture Trustee with contractual duties.

### III.

We review <u>de novo</u> determinations of law, whether reached by the district court or the bankruptcy court. <u>See</u> <u>In re Simmons</u>, 200 F.3d 738, 741 (11th Cir. 2000). We set aside the bankruptcy court's factual findings only if they are clearly erroneous. <u>Id.</u> The interpretation of contractual language is a question of law. <u>Tobin v. Mich. Mut. Ins. Co.</u>, 398 F.3d 1267, 1274 (11th Cir. 2005) (citing <u>Bragg v. Bill Heard Chevrolet, Inc.</u>, 374 F.3d 1060, 1065 (11th Cir. 2004)). Thus, we review <u>de novo</u> whether the district court correctly concluded that BONY was a conventional trustee.

BONY contends that it succeeded NationsBank as Indenture Trustee. To whit, BONY claims that its obligations to the Debtor and to the Noteholders were governed exclusively by the terms of the Trust Indenture Agreement. BONY argues that the Trust Indenture Agreement imposed no obligation on the Indenture

the [Rule 11] notice issue at the district court level, we review for plain error.") (citing <u>United States v. S. Fabricating Co.</u>, 764 F.2d 780, 781-82 (11th Cir. 1985)).

Trustee to pay interest on the Prepayment Funds provided by the Debtor for the purpose of satisfying the Notes.

The <u>sine</u> <u>qua</u> <u>non</u> of BONY's theory is its implicit assertion that it assumed NationsBank's obligations under the Trust Indenture Agreement. In response, the Debtor contends that the Trust Indenture Agreement terminated once the Prepayment Funds were transferred to NationsBank and NationsBank released its lien on the Debtor's assets.

## A.

Before we can determine whether the Trust Indenture Agreement limited BONY's duties as it claims, we must first consider whether BONY is in fact an Indenture Trustee. In other words, was BONY a party to the Trust Indenture Agreement such that its obligations to the Debtor are contractually limited by that instrument? The parties do not dispute that NationsBank was the original Indenture Trustee and a party to the Trust Indenture Agreement. In December 1995, BONY bought NationsBank's corporate trust division, and by way of that acquisition gained control over the Debtor's Prepayment Funds. It is by this acquisition that BONY now claims it succeeded NationsBank as the Indenture Trustee.

BONY correctly points out that, unless the Debtor defaults on its

32

obligations to its Noteholders, "the indenture trustee shall not be liable except for the performance of such duties as are specifically set out in [the trust] indenture." 15 U.S.C. § 77ooo(a)(1). The scope of the Indenture Trustee's duties and liabilities, therefore, is dictated by the express terms of the Trust Indenture Agreement. See Baker v. Summit Bank, 46 Fed. Appx. 689, 690 (3d Cir. 2002) ("It is well settled that under the Trust Indenture Act, the obligations of the Indenture Trustee are limited to the terms of the Indenture."); Elliot Assocs. v. J. Henry Schroder Bank & Trust, Co., 838 F.2d 66, 71 (2d Cir. 1988) ("[I]t is clear from the express terms of the [Trust Indenture] Act and its legislative history that no implicit duties . . . are imposed on the trustee to limit its pre-default conduct."); Meckel v. Cont'l Res. Co., 758 F.2d 811, 816 (2d Cir. 1985) (stating that "[u]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement"). The Indenture Trustee is therefore a creature created and governed by contract.

To support its assertion that it succeeded NationsBank as Indenture Trustee, BONY must argue that it assumed NationsBank's contractual obligations under the Trust Indenture Agreement. BONY offers no explicit justification for finding that such an assumption took place. Instead, BONY implies that it assumed the

33

obligations of Indenture Trustee when it purchased NationsBank's corporate trust division. The fact of this acquisition, standing alone, is legally insufficient to support the conclusion that BONY assumed NationsBank's contractual obligations.

Under Florida law,[21] an "assignor cannot relieve himself of his obligations [under a contract] by an assignment unless the party with whom he contracted agrees to accept the responsibility of the assignee." 3A Fla. Jur. 2d Assignments § 26 (2006) (citing Kornblum v. Henry E. Mangels Co., 167 So. 2d 16 (Fla. Dist. Ct. App. 1964)). Normally, an assignment involves only the assignee's acquisition of rights under a contract and not the assignor's obligations, unless it is found that the assignment was also a novation. Sans Souci v. Div. Fla. Land Sales & Condos., 448 So. 2d 1116, 1120 (Fla. Dist. Ct. App. 1984).

A novation is a mutual agreement between the parties to a contract for the discharge of a valid existing obligation by the substitution of a new valid obligation. Jakobi v. Kings Creek Vill. Townhouse Ass'n, Inc., 665 So. 2d 325, 327 (Fla. Dist. Ct. App. 1995). "There are four essential elements necessary to form a substitute contract or novation: (1) the existence of a previously valid

---

[21] Pursuant to Section 1.12 of the Agreement, the Agreement "shall be construed in accordance with and governed by the laws of the State of Florida."

contract; (2) the agreement of the parties to cancel and extinguish the first contract; (3) the agreement of the parties that the second contract takes the place of the first; and (4) the validity of the new contract." Id. Although consent of the parties to substitute a new contract for the old may be implied from surrounding circumstances, "this is not to say that mere knowledge of the assignment by the obligee and acquiescence therein, alone is sufficient to release the original obligor and create a novation." Sans Souci, 448 So. 2d at 1121.

BONY has not alleged, let alone proved, that a novation of the Trust Indenture Agreement took place. BONY has not asserted, nor is there any proof in the record, that the Debtor and NationsBank ever contemplated the cancellation of the Trust Indenture Agreement for the purpose of creating a new agreement with BONY. More fundamentally, BONY has adduced no evidence of a second contract that could be construed as replacing the Agreement. In oral argument before this court, BONY's counsel admitted that BONY had not produced a copy of its acquisition agreement with NationsBank, nor any other document that would set forth the terms of that acquisition. In fact, BONY could not even confirm that it received a copy of the Trust Indenture Agreement prior to the acquisition.

Consequently, we need not reach the question of whether the parties agreed that said second contract replaced the first, or whether said second contract was

35

valid. Given that BONY has failed to demonstrate that it assumed NationsBank's contractual obligations as Indenture Trustee, we cannot conclude that BONY became the Indenture Trustee when it acquired NationsBank's corporate trust division.[22]

BONY offers the following factual recitation in response to the Debtor's allegation that it never received a copy of the Trust Indenture Agreement: "(a) the Trust Indenture was part of the confirmed plan of reorganization, (b) the funds held by NationsBank were subject to the Trust Indenture when tendered to NationsBank, and (c) the funds transferred by NationsBank to [BONY] were to be paid to [N]oteholders in accordance with the terms of the plan, the Trust Indenture, and the bankruptcy court's defeasance Order."

This characterization of events, even if accepted as true, does not answer the

---

[22] Section 10.12 of the Trust Indenture Agreement stated that a merger or acquisition of NationsBank's corporate trust business makes the acquiror the indenture trustee "without the execution or filing of any paper or any further act on the part of any of the parties hereto." BONY may be inclined to argue that this provision shows the Debtor's intent that BONY become the Indenture Trustee. However, BONY is not a party to the Trust Indenture Agreement, and so has no rights or obligations pursuant to its terms. See 11 Fla. Jur. 2d Contracts § 19 (2006) ("In Florida, a contract cannot bind one who is not a party thereto, because in order to create an enforceable contract, there must be reciprocal assent to a certain and definite proposition." (citing In re Univ. Ctr. Hotel, Inc., 323 B.R. 306 (Bankr. N.D. Fla. 2005))). While it can be argued that this provision did express the Debtor's agreement to cancel the Trust Indenture Agreement in the event that NationsBank transferred its corporate trust department, BONY would still need to provide evidence of an agreement with NationsBank to undertake the role of Indenture Trustee. As we later discuss, however, this provision did express the Debtor's intention that NationsBank's successor replace NationsBank as trustee.

salient question of whether BONY was an Indenture Trustee.  It is entirely

plausible that BONY accepted the Prepayment Funds and disbursed them to the

Noteholders in a manner outwardly consistent with the Trust Indenture

Agreement, without any actual knowledge of what the Agreement required, and

without actually accepting NationsBank's responsibilities as Indenture Trustee.[23]

Put another way, BONY's actions with respect to the Prepayment Funds will not

substitute as proof that it entered into a formal agreement with NationsBank and

the Debtor to assume the role of Indenture Trustee.[24]

Curiously, BONY faults the Debtor for failing to provide any written

agreement, other than the Trust Indenture Agreement, that might set forth BONY's

rights and duties with respect to the Prepayment Funds.  It is BONY that has

asserted that its relationship to the Debtor and to the Noteholders is governed by

the Trust Indenture Agreement.  It was not the Debtor's obligation to provide

---

[23]  There is no evidence in the record that BONY acquired personnel as well as trust accounts with NationsBank's corporate trust department.  Moreover, there is no indication of which records (if any) NationsBank provided to BONY.  In short, we have no evidence as to how or when BONY came to understand the purpose of the Prepayment Funds, or how or when BONY identified the persons to whom those Prepayment Funds were payable.

[24]  BONY would have us give legal effect to the fact that the bankruptcy court and the Debtor referred to BONY as "indenture trustee" at several points in the record below.  For example, the Debtor's December 13, 2000 motion stated that "[t]he Bank of New York became the indenture trustee" after its acquisition of NationsBank's corporate trust division, and that BONY held the Prepayment Funds "pursuant to the trust indenture."  Again, absent proof of a novation or of an assignment of NationsBank's obligations to BONY, we must conclude that such references were in error.

37

BONY with the evidence it needed to prove its allegations.

B.

Having eliminated the possibility that BONY was an Indenture Trustee, we address the question of what obligations, if any, BONY had to the Debtor. The Debtor asserts that the role of Indenture Trustee terminated when it transferred the Prepayment Funds to NationsBank, and that pursuant to Section 8.02 of the Trust Indenture Agreement, NationsBank held those funds in a common law trust. In sum, the Debtor asserts that the duties owed to it by BONY were not governed by the terms of the Agreement. Rather, the Debtor contends that BONY was a common law trustee with an attendant fiduciary duty.

In its orders, the bankruptcy court repeatedly stated that BONY owed a fiduciary duty to the Debtor and to the court. The court, however, never explicitly stated a legal basis for this conclusion. Apparently, the court assumed that BONY became a common law trustee with respect to the Prepayment Funds when it purchased NationsBank's corporate trust division.

The district court came to the same conclusion, though by explicitly articulated means. The court focused on the fact that the Debtor transferred the Prepayment Funds to NationsBank before BONY acquired NationsBank's corporate trust division. From this fact the court inferred that NationsBank's

rights and obligations under the Trust Indenture Agreement were extinguished once the Debtor provided the funds to satisfy the Notes in full. Put another way, the district court regarded the transfer of the Prepayment Funds to NationsBank as a termination of both the Trust Indenture Agreement and of NationsBank's role as Indenture Trustee. Consequently, that role could not have passed to BONY as part of its acquisition. Instead, NationsBank became a common law trustee with respect to the Prepayment Funds, and BONY succeeded in that capacity once the acquisition was effected. The district court, however, did not provide a legal basis for concluding that BONY could assume the role of common law trustee from NationsBank.

1.

We begin our assessment of BONY's argument by addressing the district court's conclusion that NationsBank's duties regarding the Prepayment Funds were those of a common law trustee, as opposed to those of an Indenture Trustee. While we agree with this conclusion, we find that the district court could have reached it by analyzing the terms of the Trust Indenture Agreement itself. Specifically, the Agreement established different trustee obligations depending on the res to be held in trust. It made clear that the trust for the Prepayment Funds is not governed by the terms of the Agreement or the TIA. Separate and apart from

39

delineating the role of Indenture Trustee, the Agreement was a trust instrument that expressed the Debtor's intention to create a conventional trust for the Prepayment Funds.

"'The polestar of trust interpretation is the settlor['s] intent.'" Roberts v. Sarros, 920 So. 2d 193, 195 (Fla. Dist. Ct. App. 2006) (quoting L'Argent v. Barnett Bank, N.A., 730 So. 2d 395, 397 (Fla. Dist. Ct. App. 1999)). "If the trust language is unambiguous, the settlor['s] intent as expressed in the trust controls . . . ." Id. (citing L'Argent, 730 So. 2d at 397; Ludwig v. AmSouth Bank of Fla., 686 So. 2d 1373, 1376 (Fla. Dist. Ct. App. 1997)). "In determining the settlor's intent, the court should . . . construe 'the instrument as a whole,' taking into account the general dispositional scheme." Id. (quoting Pounds v. Pounds, 703 So. 2d 487, 488 (Fla. Dist. Ct. App. 1997)).

Section 4.03 of the Trust Indenture Agreement stated that the Indenture Trustee's responsibilities with respect to the Collateral for the Notes were governed by the terms of the Agreement and the TIA.[25] That section directed the Indenture Trustee to "perform its obligations under the Security Documents in

---

[25] The terms "Collateral" and "Escrow Account" are defined in footnote 2, supra. The Agreement's definition of the term "Trust Moneys" includes all moneys, including the net proceeds from the sale of the Collateral, paid into the Escrow Account. The Trust Moneys were essentially part of the Collateral securing the Notes.

accordance therewith,"[26] but its obligations were also limited "by the provisions of the TIA," the federal statute under which the role of Indenture Trustee was created. Similarly, Section 7.01 of the Trust Indenture Agreement placed the responsibility for disbursing the Trust Moneys, including those held in the Escrow Account, on the Indenture Trustee alone.[27] With respect to the Collateral and the Trust Moneys, the Indenture Trustee's obligations were expressly limited to the Agreement and the TIA. These obligations included taking care of the Collateral and the Trust Moneys.

In contrast, Section 15.04 (entitled "Deposit of Prepayment Price")[28] of the Agreement set out the procedure by which the Debtor must deposit the Prepayment Funds for payment of the Notes. It stated:

> On or prior to any Prepayment Date, the [Debtor] shall deposit with the Trustee or with a Paying Agent (or, if the Company is acting as its own

---

[26] Section 1.01 of the Agreement defines "Security Documents" as "any and all security agreements, mortgages, deeds of trust and deeds to secure debt (including collateral assignments obtained pursuant thereto), assignments, pledges and other agreements or documents pursuant to which the [Debtor] grants a security interest in or lien upon, or otherwise pledges or assigns, any Collateral to the Trustee for the benefit of the Noteholders."

[27] Under limited circumstances, the Debtor was permitted to use insurance proceeds placed in the Escrow Account to repair the property held by the Indenture Trustee as Collateral. Even here, the funds could not be released from the Escrow Account unless certain proofs were provided to the Indenture Trustee.

[28] We note that Section 1.08 states that "[t]he Article and Section headings herein are for convenience only and shall not affect the construction hereof." We therefore give no interpretive effect to the Agreement headings mentioned in this opinion.

41

Paying Agent, segregate and hold in trust as provided in Section 14.03) an amount of money sufficient to pay the Prepayment Price of all the Notes which are to be prepaid on that date. Such money shall be held in trust [f]or the benefit of the Persons entitled to such Prepayment Price and shall not be deemed to be part of the Collateral or Trust Moneys.

Under this provision, the Debtor could have deposited the Prepayment Funds with one of three entities: the Indenture Trustee, a "Paying Agent,"[29] or itself. Clearly, the Paying Agent and the Debtor did not become Indenture Trustees (trustees whose duties were dictated by the Trust Indenture Agreement and the TIA) simply because they held Prepayment Funds for the benefit of the Noteholders. Section 15.04 did not provide different obligations for different entities; each entity was charged to hold the Prepayment Funds "in trust" without further modification. In addition, Section 15.04 explicitly separated the Prepayment Funds by stating that they "shall not be deemed to be part of the Collateral or Trust Moneys." The trust into which the Prepayment Funds had to be placed, therefore, was separate and distinct from the trust containing the Collateral.

This reading is bolstered by Section 8.02 of the Trust Indenture Agreement, which is entitled "Application of Deposited Money." Echoing the language of Section 15.04, this section stated, in pertinent part:

_____

[29] Section 1.01 defines a "Paying Agent" as a "any person authorized by the [Debtor] to pay the principal of, or interest on, any Notes on behalf of the [Debtor]."

Moneys deposited with the Trustee pursuant to Section 8.01 [which dealt with the satisfaction and discharge of the Notes] shall not be a part of the Collateral and shall not be deemed to be Trust Moneys but shall constitute a separate trust fund for the benefit of the Persons entitled thereto.

Here, the Agreement explicitly stated that the funds used to discharge and satisfy the Notes, including the Prepayment Funds, were not part of the Collateral held by the Indenture Trustee and not part of the Trust Moneys. Rather, those funds had to be placed in a separate trust set up for the benefit of third parties. The Agreement in no way limited or modified the responsibilities of the trustee for this separate trust, nor did the Agreement anywhere provide that the duties owed by the trustee for this separate trust were limited by the TIA. Moreover, and unlike its treatment of the Collateral, the Debtor did not give the Indenture Trustee a security interest in, a lien upon, or otherwise pledge or assign the Prepayment Funds to the Indenture Trustee.

That the Agreement provided different responsibilities for the Indenture Trustee than it did for the Prepayment Funds trustee is sensible given the purpose of the Trust Indenture structure. The Trust Indenture was created to secure the obligation of the Debtor in an administratively manageable fashion. Given the insolvency of the Debtor, its Class 7 Creditors were provided with liens on the Debtor's assets as security in case the Debtor failed to meet its obligations. These

43

liens were then pooled and transferred to a single Indenture Trustee, who would act on behalf of the Noteholders if the Debtor defaulted. Once the Prepayment Funds were tendered, however, the Noteholders no longer had any concerns regarding the Debtor's insolvency. The amount needed to satisfy the debt had been provided; that, in turn, extinguished the need to foreclose on the liens to exact payment. Consequently, an Indenture Trustee was no longer necessary.

Reading Sections 4.03, 8.02 and 15.04 together, we must conclude that the Debtor intended the Prepayment Funds to be held in a common law trust. The responsibilities of Indenture Trustee, as governed by the Trust Indenture Agreement and the TIA, did not apply to the trust in which the Prepayment Funds were held. Additionally, there was no other limitation on or modification of the trustee's duties with respect to the Prepayment Funds. Rather, these funds, when provided by the Debtor, had to be held in a common law trust, and the trustee charged with caring for them had to be a common law trustee.

## 2.

Having established that the Prepayment Funds were required to be held in a common law trust, we turn to the question of whether the role of common law trustee passed to BONY when it acquired NationsBank's corporate trust division. If it did, it was not pursuant to an agreement between the Debtor and BONY;

rather, the role of common law trustee had to have passed to BONY, as successor

trustee, under the terms of the Trust Indenture Agreement between the Debtor and

NationsBank.

The Trust Indenture Agreement provided for a successor trustee.[30] Section

10.12 of the Agreement (entitled "Merger, Conversion, Consolidation or

Succession to Business") provided for the appointment of a successor trustee in

the event the original trustee transferred control of its trust business. It stated, in

relevant part:

> Any corporation into which the Trustee may be merged or converted or with
> which it may be consolidated, or any corporation resulting from any merger,
> conversion or consolidation to which the Trustee shall be a party, or any
> corporation succeeding to all or substantially all of the corporate trust
> business of the Trustee, shall be the successor of the Trustee hereunder . . .
> without the execution or filing of any paper or any further act on the part of
> any of the parties hereto.

Section 10.12 unambiguously expressed the will of the Agreement's creator, the

Debtor, that the entity that purchased NationsBank's corporate trust division

become the successor trustee. This section placed no limit on its effect; its plain

---

[30] Unless there is a statute to the contrary, an instrument creating a trust may provide for the succession of a trustee directly, indirectly, or by implication alone. See 90 C.J.S. Trusts § 289 (2005) (citing Payiasis v. Robillard, 171 So.2d 630 (Fla. Dist. Ct. App. 1965). "[A] successor appointed by the trust instrument takes his place automatically without court action, and it is competent for the creator of the trust to provide directly for the filling of vacancies in the trusteeship by the naming of the persons to be substituted." Douglas Props. v. Stix, 159 So. 1, 5 (1935).

language indicated that any trustee, Indenture Trustee or common law trustee, would become NationsBank's successor provided the other trustee qualifications were met.[31]  Obviously, that entity was BONY.

Section 10.12 could not bind BONY as a matter of contract law.  BONY was not a party to the Trust Indenture Agreement, and there is no evidence that a tripartite novation took place that substituted BONY as the Indenture Trustee.  The expression of will contained in Section 10.12 did have effect as a matter of trust law, however, and it operated to transfer NationsBank's common law trustee obligations to BONY.  We therefore affirm the district court's conclusion that BONY held the Prepayment Funds as a common law trustee.[32]

3.

As common law trustee for the Prepayment Funds, we have no doubt that BONY owed a fiduciary duty to the beneficiaries of that trust.  The question, then, is whether the Debtor was a trust beneficiary to whom BONY owed a fiduciary

---

[31]  The Trust Indenture Agreement set out several preconditions governing the selection of a trustee or a successor trustee, which are not relevant to this appeal.

[32]  BONY argues that the requirements for termination of the Trust Indenture Agreement set out in Section 8.01 were never satisfied.  That section requires, among other things, that the Debtor deliver to the Indenture Trustee an Officers' Certificate and opinion of counsel stating that all conditions precedent relating to the satisfaction of the Notes have been met.  We need not address this argument further.  As discussed above, BONY has provided us with no reason to conclude that it was a party to the Trust Indenture Agreement such that the termination provisions in Section 8.01 would apply.

duty. The Debtor contends that once the Prepayment Funds were provided to NationsBank on October 2, 1995, NationsBank (and thereafter BONY) held those funds for the benefit of the Noteholders in the first instance, and then for the benefit of the Debtor with respect to any Prepayment Funds the Noteholders did not claim. In effect, the Debtor claims that it was the residuary beneficiary of the trust.

BONY has conceded that the Debtor is the residuary beneficiary of the Prepayment Funds trust. In its "Response in Opposition to the Debtor's Motion to Surcharge the Bank of New York and to Direct Payment of Interest," filed with the bankruptcy court on June 14, 2002, BONY asserted that the Debtor had no greater claim to interest on the Prepayment Funds than did the Noteholders. In so doing, BONY admitted that "all the Debtor had was a contingent remainder right to the Prepayment Funds, should those funds go unclaimed." BONY reiterated this argument in its opening brief to us.

4.

Finally, we must determine whether BONY's fiduciary duty included a duty to pay interest to the Debtor on the Prepayment Funds. Fiduciaries have an unflagging duty of loyalty to the beneficiaries whom they serve, and to avoid conflicts of interest. See Compton v. Fifth Ave. Ass'n, Inc., 7 F. Supp. 2d 1328,

47

1333 (M.D. Fla. 1998). A conflict of interest arises when the fiduciary profits from the property entrusted to its care, and does so at the expense of the property's beneficiaries. "A cardinal rule of the law of trusts is that a trustee may not . . . manage the affairs of the trust property so as to gain any advantage directly or indirectly for himself beyond his lawful compensation." John G. Grimsley, Fla. Law of Trusts § 6-4 (4th ed. 1993).

Here, BONY held the Debtor's Prepayment Funds, $487,844.90, for over five years. During that time, BONY profited on those funds while the Debtor was unable to use them.[33] Moreover, BONY did not relinquish its profit to the Debtor. Such self-dealing was a clear violation of BONY's duty of loyalty to the Debtor.

In large measure, BONY's challenge of the court's award of interest is based on its belief that it was under no obligation to accrue interest on the Prepayment Funds. BONY bases this argument on Section 10.06 of the Trust Indenture Agreement, which stated, in relevant part:

> Money held by the Trustee in trust hereunder need not be segregated from other funds except to the extent required by law. The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed with the [Debtor].

---

[33] As explained in section II.A.2., supra, BONY defaulted its right to challenge the Debtor's allegation that BONY had earned interest income on the Prepayment Funds between April 1996 and October 2001.

BONY's reliance on Section 10.06 is misplaced for two reasons. First, as a general matter, Section 10 of the Trust Indenture Agreement outlined the contractual obligations and rights of the Indenture Trustee. Section 10.01 stated that "the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee." As we have established, BONY was not the Indenture Trustee. Accordingly, the protections afforded to the Indenture Trustee by Section 10.06 did not apply to BONY.

Second, the funds to which Section 10.06 referred cannot be the Prepayment Funds. As already discussed, Sections 8.02 and 15.04 of the Trust Indenture Agreement specifically required that the Prepayment Funds be placed in a separate trust. Section 10.06, on the other hand, provided that the funds held by the Trustee need not be held in a separate trust. If Section 10.06 applied to the Prepayment Funds, it would obviously conflict with the clear directive expressed in Sections 8.02 and 15.04. We must conclude, therefore, that Section 10.06 does not apply to the Prepayment Funds.

**IV.**

The district court correctly concluded that the bankruptcy court did not abuse its discretion when it imposed sanctions on BONY for its dilatory conduct

49

and repeated refusal to obey the court's orders. Although the district court did not address the part of the bankruptcy court's sanctions that effectively struck BONY's response to the Debtor's claim for interest, we do so and conclude that the bankruptcy court acted well within its inherent power to manage the case. The district court determined that BONY was not an Indenture Trustee but, instead, a common law trustee when it took possession of the Prepayment Funds, and that it owed a fiduciary duty to the Debtor and to the bankruptcy court. We affirm that determination for the reasons set out in part III of this opinion. The judgment of the district court is, accordingly, affirmed.

**SO ORDERED.**